**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE WITH ASSIGNED CALL NUMBER (857) 452-0131, WITH INTERNATIONAL MOBILE SUBSCRIBER IDENTITY 310240231531472 | No. 2:24-mj-329-KFW |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Jonathan Duquette, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (857) 452-0131, with International Mobile Subscriber Identity/Electronic Serial Number 310240231531472 ("the SUBJECT PHONE"), with no listed subscriber, whose service provider is T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey. The SUBJECT PHONE is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," see 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. See 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. See 18 U.S.C. § 3123(b)(1).

3. I am a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI). I have been in this position since June 2015, and I have been a Task Force Officer in FBI's Boston Division since January 2018. I am also a Border Patrol Agent with the U.S. Border Patrol and have been in this position since December 2009. In my career, I have utilized various investigative tools and techniques, to include the use of search warrants.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested search warrant.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841, 843, and 846 have been committed, are being committed, and will be committed by the user of the SUBJECT PHONE. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

6. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, see 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7. I know from my participation in the investigation, that following months of covert operations and numerous controlled purchases of substantial quantities of illegal drugs, including more than a kilogram of methamphetamine, and more than 120

grams of fentanyl, the U.S. Attorney's Office for the District of Maine (the "USAO") charged a target of the investigation ("Cooperating Defendant-1" or "CD-1") with offenses including conspiracy to distribute, and the distribution of, controlled substances, in violation of 21 U.S.C. §§ 846 and 841, the use of a person under 18 years of age in drug operations, in violation of 21 U.S.C. § 861, and unlawful possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1).

8. Thereafter, CD-1 began cooperating with the government, including sitting for multiple proffer sessions with the USAO and the FBI. It is anticipated that CD-1 will plead guilty to the charges described above for his role in trafficking methamphetamine, fentanyl and other drugs into southern and western Maine. CD-1 is cooperating with this investigation in the hopes of receiving leniency at sentencing. From CD-1's proffers, I learned, among other things, the following:

   a. CD-1 identified their most recent drug supplier as "Fatpocket" who utilized telephone number (857) 452-0131, the TARGET PHONE. CD-1 purchased pound quantities of methamphetamine, half kilogram quantities of cocaine and kilograms of "pure" fentanyl from Fatpocket. CD-1 would cut (dilute) the pure fentanyl with lactose and turn one kilogram of pure fentanyl into ten kilograms of sellable product. CD-1 did not want anyone to overdose on their fentanyl mixture, so they made sure their fentanyl mixture was thoroughly diluted. When CD-1 communicated with Fatpocket, he (Fatpocket) claimed to have access to 20 pounds of drugs and was trying to persuade CD-1 to take extra drugs. CD-1 claimed they spoke to Fatpocket on Facetime using the number assigned to the TARGET PHONE.

   b. When buying drugs from Fatpocket, CD-1 would meet Fatpocket's "runner" in Kittery, Maine to purchase drugs or the "runner" would deliver the drugs to

3

where CD-1 was "trapping" (meaning selling drugs) in Maine. Fatpocket would not deliver drugs, but if the purpose of the trip was solely to pick up money, then Fatpocket would make the trip personally.

      c.    CD-1 introduced his minor younger brother ("CC-1"), who is currently being prosecuted for drug offenses by state authorities in Maine, to Fatpocket so CC-1 could purchase drugs from him. CD-1 said CC-1 typically purchased two to three pounds of methamphetamine, half a kilogram of fentanyl, and one-quarter kilogram of cocaine at a time. CD-1 said CC-1 would send a "runner" down to Massachusetts to meet Fatpocket and then return to Maine with the drugs.

      9.    During the course of this investigation, FBI seized two cellular phones from CD-1. Pursuant to judicially authorized warrants, those devices were searched for evidence of drug trafficking activity. While reviewing an extraction of one of the devices, I located a text message conversation that occurred between about June 5, 2024, and about June 17, 2024, between CD-1 and a contact listed as "Fatpocket" who was assigned the call number of the TARGET PHONE. Below are parts of their conversation:



10. In the above conversation, CD-1 provided the address of 262 Western Avenue, Augusta, Maine. Based on a Google Search, that address is a Rusty Lantern Market and Irving Gas Station in Augusta, Maine. Their conversation continued:





11.     As shown above, most of the conversation between CD-1 and Fatpocket was in Spanish. I utilized Google Translate to obtain a basic translation of the conversation from Spanish to English. From reviewing that translation, I learned the following: Fatpocket told CD-1 to call him (Llámame). CD-1 responded with an address of 138 Old County Road, Bryant Pond, Maine. Fatpocket followed up with a photograph of a phone showing Google Map directions to the address 138 Old County Road, Bryant Pond, Maine indicating Fatpocket was two hours and 23 minutes away from the location. The Google Map Street view on the phone showed a vacant lot. Fatpocket followed up with, it is there[?] (es hay). CD-1 replied, yes (Si). Fatpocket followed up with, That's parking [?] (Eso es parqueo) and then old [?] (Viejo). CD-1 responded, No the house is there (No la casa ta ahi). CD-1 continued, you know that is a very old photo (Tu sabe que eso es una foto viejisima).

12.     On about June 15, 2024, Fatpocket sent CD-1 a video showing plastic wrap and a bundle of United States currency wrapped in plastic. The video was in Spanish and was narrated by what sounded like a man's voice. I had a native Spanish speaker listen to the video and describe what the person was saying. The narrator said the rolls (of plastic wrap) can be purchased at Walmart and have a blue handle. He continued

that he wanted his money wrapped in plastic wrap on the next delivery[1]. A screenshot of the video is below.



13.     I know from my participation in the investigation that during the execution of a judicially authorized search warrant by FBI on about June 18, 2024, CC-1 was encountered and arrested at 138 Old County Road, Bryant Pond, Maine. CD-1 provided the same address (138 Old County Road, Bryant Pond, Maine) to Fatpocket approximately four days before the search warrant was executed.

14.     I obtained subscriber and call detail records (CDRs) from T-Mobile on the TARGET PHONE on September 9, 2024. No information was listed for the subscriber which, in my experience, indicates that the phone is served through a pre-paid service provider (i.e. TracFone). The CDRs showed the TARGET PHONE attempted to contact CD-1 at least four times after CD-1's phone was seized by the FBI pursuant to arrest (on about June 18, 2024). The last known attempt was on August 20, 2024. CDRs also

---

[1] This is not a verbatim translation of the video, it is a general description of what was said.

showed the TARGET PHONE was in contact with a known telephone number for a main target of the FBI North Shore Gang Task Force (located in Massachusetts). The TARGET PHONE contacted the North Shore Gang Task Force's target 28 times between May 5, 2024, and June 16, 2024. On August 14, 2024, the North Shore Gang Task Force's target was indicted on federal drug and firearms charges.

15. On about September 18, 2024, a "Ping" warrant and "pen register" was issued in the United States District Court, District of Maine filed under case 2:24-mj-291-KFW on the TARGET PHONE. T-Mobile complied with the order and provided data starting on about September 18, 2024. The precision varies as the TARGET PHONE utilizes different towers, but the typical radius of the Ping is approximately one mile in the Lawrence, Methuen, North Andover, Massachusetts vicinity. With a large radius, the user of the TARGET PHONE has not been able to be identified.

16. During the 30-day window when the "Ping" was active, between about September 19, 2024 and October 17, 2024, Fatpocket communicated with multiple numbers that are targets or associates of targets to multiple FBI investigations.

**ADDITIONAL INFORMATION REGARDING WIRELESS PROVIDERS**

17. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built

8

into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

18. Based on my training and experience, I know that T-Mobile can collect cellsite data about the SUBJECT PHONE. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. This information can be extremely useful when attempting to locate a suspect or identify his or her past historical location. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes. By analyzing the incoming and outgoing phone numbers along with the duration, date, and time of who the subject (SUBJECT PHONE) is communicating with through the cellular service provider's records can assist law enforcement in identifying the other party to the call. By running those telephone numbers through normal investigative steps and searches through open-source public

databases, this can lead to the identification of specific locations such as a hotel, residence, or other type of physical address. When used in conjunction with cell-site and other precision location information can lead to identifying and confirming specific addresses or areas of interest where the subject is or has been. This information is also necessary and part of the service provider's call detail records (ordinary business records) associated with historical cell-site information and is necessary to gain a more complete understanding and more accurate view of a subject's historical and perspective location.

19. Based on my training and experience, I know that cellular providers such as T-Mobile can also collect Timing Advance data, which is also referred to as Per Call Measurement Data ("PCMD"), the "real-time tool" ("RTT"), and True Call data. Timing Advance data estimates the approximate distance of the cellular device from a cellular tower based upon the time it takes for signals to travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

20. Based on my training and experience, I know that each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), an International Mobile Equipment Identity ("IMEI"), a Subscription Permanent Identifier ("SUPI"), and/or a Network Access Identifier ("NAI"). The unique identifiers – as

10

transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content. Also, once the subject has been taken into custody, this identifying account information (to include email addresses and subscriber information) may also be necessary for evidentiary purposes to identify the cellular records with the subject's phone itself on a particular date and time. Furthermore, other identifying information such as subscriber information, email addresses associated with the user of the account, all assist law enforcement identify and confirming the end user (subject) to the account maintained by the service provider. This information may also help identify if the subject discontinues service, changes devices (such as IMEI, ESN, MEID, or SUPI), or if someone else begins using this telephone number after the subject terminates the account or provides the phone to another user.

21. Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's user or users.

## AUTHORIZATION REQUEST

22. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

23. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the SUBJECT PHONE Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

24. I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile. I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a

signal to determine the location of the SUBJECT PHONE on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

25. I further request that the Court authorize execution of the warrant at any time day or night, owing to the potential need to locate the SUBJECT PHONE outside of daytime hours.

Respectfully submitted,

Jonathan Duquette
Task Force Officer
Federal Bureau of Investigation

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Oct 25 2024

City and state: Portland, Maine

Judge's signature

Karen Frink Wolf, U.S. Magistrate Judge
Printed name and title